IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| JACKIE RUSSELL KEETER, | § | |
| Institutional ID No. 935295, | § | |
| SID No. 04000659, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:20-CV-00066-BU |
| | § | |
| | § | |
| LORIE DAVIS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## ORDER TO ANSWER AND FOR PARTIAL DISMISSAL

Pro se Plaintiff Jackie Russell Keeter is an inmate at the TDCJ's Allred Unit where he is serving a life sentence. He filed this civil action under 42 U.S.C. § 1983 complaining of events that occurred at TDCJ's Robertson Unit in Abilene, Texas. Dkt. No. 1. The Court granted Keeter leave to proceed *in forma pauperis*, which subjects his Complaint to the Court's preliminary screening under 28 U.S.C. § 1915. Dkt. No. 7. And because Keeter, an inmate, sues a government entity, officer, or employee, his Complaint is also subject to screening under 28 U.S.C. § 1915A. The case was transferred to the undersigned to conduct the preliminary screening required by those statutes. Dkt. No. 8. The undersigned was also designated to exercise jurisdiction to conduct all proceedings as provided in 28 U.S.C. § 636(c), including the entry of judgment. *Id*. Keeter later consented to the undersigned exercising the full jurisdiction of this Court. Dkt. No. 15.

The undersigned held an evidentiary hearing on April 26, 2021, to further develop the factual bases for Keeter's claims, in accordance with *Spears v. McCotter*, 766 F.2d 179, 181–82 (5th Cir. 1985) and 28 U.S.C. § 1915.

Keeter brings claims under the Eighth Amendment for prison officials' failure to protect him from sexual assault by his cellmate. Dkt. No. 1. He claims that the assaults happened because he was improperly matched with a violent G5 cellmate in violation of Prison Rape Elimination Act (PREA) standards. Keeter brings these claims against Lori Davis, Director of the TDCJ-CID[1]; Gene Monroe, Regional Director of the TDCJ[2]; Steven Sperry, Middleton Unit Warden; Monte Griffin, Middleton Unit Assistant Warden; Karla Sadler, Major of Operations at the Middleton Unit; Michelle Florida, Middleton Unit Classification Committee Case Manager; Crystal Hudson, Captain of the Middleton Unit Correctional Officers; and Paul Weaver[3], Correctional Officer III.

After considering the allegations in Keeter's Complaint, his *Spears* hearing testimony, the authenticated TDCJ records, and the applicable law, the Court finds that Keeter's failure-to-protect claims against Sadler, Hudson, Florida, and Weaver survive the Court's preliminary screening. But the Court finds that Keeter's claims against Griffin for

---

[1] Since Bobby Lumpkin has succeeded Lorie Davis as the Director, he is "automatically substituted as a party." FED. R. CIV. P. 25(D). All claims originally brought against Davis will be construed in this Order as claims against Lumpkin.
[2] Keeter's claim against Monroe was brought against him as John Doe 1 because Keeter was unaware as of the Regional Director's name. *See* Dkt. No. 1. The undersigned has determined through reliable sources, including TDCJ's website, that TDCJ-CID's Region VI includes the Middleton Unit, and that the Regional Director of Region VI in 2019 when Keeter's claims arose was Gene Monroe. *See Criminal Justice Connections*, TEX. DEP'T OF CRIM. JUST., (Mar. 2019) https://www.tdcj.texas.gov/connections/-articles/2019/20190300_new_directors.html. All claims originally brought against John Doe 1 will be construed in this Order as claims against Monroe.
[3] Keeter's claim against Weaver was also brought against him as John Doe 2, but the authenticated TDCJ records identify John Doe 2 as Paul Weaver who was assigned as the roving officer in Keeter's cell wing at the relevant time. All claims originally brought against John Doe 2 will be construed in this Order as claims against Weaver.

failure to properly investigate allegations of sexual assault, and his claims against Griffin, Monroe, and Sperry for failure to properly train staff on proper cell assignments and preventing sexual assaults do not survive judicial screening and must be dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(i)–(ii) and 1915A(b)(1) for failure to state a claim upon which relief may be granted.

## I. PRELIMINARY SCREENING STANDARDS

A court must dismiss a complaint filed *in forma pauperis* against a government entity or employee if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2) (2016); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*).

A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A claim lacks an arguable basis in fact "if the facts alleged are clearly baseless, a category encompassing allegations that are fanciful, fantastic, and delusional." *Id*. at 327; *Denton v. Hernandez*, 504 U.S. 25, 32–33 (1992). And a complaint lacks an arguable basis in law when it is "based on an indisputably meritless legal theory." *Neitzke*, 490 U.S. at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005).

Even if a claim is not frivolous, it must still allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The facts alleged by plaintiffs must "raise a right to relief above the speculative

3

level." *Id*. at 555. While a plaintiff need not detail specific factual allegations, a complaint must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*.; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting that "the tenet that a court must accept as true all of the allegations in the compliant is inapplicable to legal conclusions").

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). The Supreme Court remarked in *Iqbal* that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. (citations omitted). In sum, when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570; *accord Iqbal*, 556 U.S. at 678.

When analyzing a complaint under these standards, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated prison records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical and other prison records if they are adequately identified and authenticated" (internal quotations omitted)).

In evaluating the factual sufficiency of a complaint, courts accept *well-pleaded* factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (emphasis added). And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

## II.  FACTUAL BACKGROUND

Keeter is serving a life sentence for indecency with a child and prior to the facts giving rise to his claims was classified at the G2 custody level, which is one of the least restrictive custody levels within the TDCJ. Dkt. No. 1 at 8. The TDCJ records reflect that G2 inmates are permitted to live in dorms or cells, and Keeter states that he was living in the dorms prior to being reclassified as G5, as explained below. *Id.*

The precipitating event to Keeter reclassification from G2 to G5 was his testing positive for methamphetamines sometime in February 2019, for which he received a major disciplinary case. *Id.* at 8–9; Tr. 00:04:50–00:06:20. Captain Crystal Hudson presided over the disciplinary hearing and found him guilty of the charged violation. Dkt. No. 1 at 9. As a result, Keeter was required to appear before the Unit Classification Committee (UCC), which is responsible for assigning offender custody levels. *Id.* at 8. Keeter complains that the UCC "dropped Plaintiff all the way down to a G-5 which is where they place the most dangerous and violent inmates." *Id.* at 9; Tr. 00:06:30–00:07:30; Tr. 00:13:00–00:13:51.

5

TDCJ records confirm that G5 inmates are those who have assaultive or aggressive disciplinary records and must live in their cells. Keeter maintains that in reclassifying him at the G5 level, the UCC showed deliberate indifference to his safety because it failed to consider his underlying conviction for indecency with a child, that he had no violent history in over 20 years in TDCJ custody, and that he is bi-sexual. *Id.* at 9. Through his *Spears* hearing testimony, Keeter specifies that assigning him to a cell with Victor Robinson, who later raped him repeatedly, was in violation of the standards in the Prison Rape Elimination Act of 2003 (PREA), 42 U.S.C. § 15601 et seq.[4] Tr. 00:07:30–00:11:30; Tr. 00:11:30–00:12:10.

As a result of being reclassified as G5, Keeter was placed in a close custody cell with "a big black man," Robinson, who was also classified at the G5 custody level and who Keeter claims had a history of assaulting his cellmates, including sexually.[5] *Id.* at 9; Tr. 00:15:00–00:15:45. After being in a cell with Robinson for about a week, Robinson began asking Keeter if he was bi-sexual. *Id.* Keeter avoided the questions, but claims that Robinson later poured a "white looking powder" into Keeter's coffee and ordered him to

---

[4] Keeter appears to be referencing 28 C.F.R. § 115.41 which provides standards for assessing inmates "during an intake screening and upon transfer to another facility for their risk of being sexually abused by other inmates or sexually abusive towards other inmates." 28 C.F.R. § 115.41(a). Those intake screening standards provide the following criteria for consideration: (1) whether the inmate has a mental, physical, or developmental disability; (2) the age of the inmate; (3) the physical build of the inmate; (4) whether the inmate has previously been incarcerated; (5) whether the inmate's criminal history is exclusively nonviolent; (6) whether the inmate has prior convictions for sex offenses against an adult or child; (7) whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming; (8) whether the inmate has previously experienced sexual victimization; (9) the inmate's own perception of vulnerability; and (10) whether the inmate is detained solely for civil immigration purposes.

[5] Part of Keeter's claim that he should not have been housed with Robinson is based on the alleged fact that Robinson was much larger than Keeter—80 pounds more—and that one of the PREA standards is to consider the physical build of the inmates. The authenticated records indicate that at the time of the assaults, Keeter was a 50-year old male with a height of five feet, eight inches and a weight of two hundred twenty-six pounds, while Robinson was a 52-year old male with a height of six feet, one inch and a weight of two hundred nine pounds.

drink it or Robinson "would beat his ass." *Id.* Keeter drank the coffee and "started to feel funny," after which Robinson raped him the first time. *Id.*

Keeter claims that Robinson repeatedly drugged and raped him on at least 9 occasions from March 8 to March 10, 2019. *Id.* at 10. Keeter states that Robinson threatened him to keep him quiet and "kept [him] drugged every day all day." *Id.* Keeter alleges that he was physically beaten by Robinson each time he attempted to resist, and that Robinson told other inmates that they could rape Keeter in exchange for providing Robinson with "K-2 dope." *Id.* Keeter states that the rapes stopped after March 10 because Robinson ran "out of K-2 dope." *Id.*

On March 14, 2019, four days after the rapes stopped, around 4:00 a.m., Keeter claims that he first reported the assaults to prison officials. *Id.* Specifically, Keeter states that he wrote an I-60—or Inmate Request for Official Action—that said, "I need help my celly sexually assaulted me," and waited for the officer to come by on his 4:00 a.m. count. *Id.* Keeter gave the I-60 to Officer John Doe 2, identified through the authenticated records as Paul Weaver, and told him that he had been raped by his cellmate and needed to speak to the warden. *Id.* But Weaver "took the note and left never to return." *Id.* After handing Weaver the I-60, Keeter claims that he was "knocked around for at least two hours" by Robinson, but then relayed his message to another officer at the shift change a couple of hours later. *Id.* At that time, Keeter was removed from the cell, taken first to the infirmary,

and then to the hospital where a nurse examined him and, Keeter claims, observed bruises consistent with being sexually assaulted.[6] *Id.* at 11.

## III. ANALYSIS

Through his Complaint and *Spears* hearing testimony, Keeter brings claims under the Eighth Amendment for (1) failure to protect from sexual assault by assigning him to a cell with a violent offender, (2) failure to protect in not immediately removing him from the cell when he first reported sexual assault, (3) failure to properly investigate allegations of sexual assault, and (4) failure to properly train on (a) proper custody level classification, (b) preventing sexual assaults. The Court considers each claim in turn.

### a. Failure to protect in assigning Keeter to a cell with Robinson

Through his Complaint, Keeter initially complained that the UCC decision to reclassify him from the G2 custody level to G5 and the decision to assign him to a cell with Robinson were both done with deliberate indifference to his safety.[7] Dkt. No. 1 at 8–9. But Keeter clarified at his *Spears* hearing that this claim is not based on the decision to reclassify him to G5, as he admits that can be done without necessarily exposing the reclassified prisoner to a substantial risk of harm.[8] Tr. 00:17:45–00:18:55; Tr. 00:20:00–00:20:20. Rather, he complains that the decision to place him in a cell with Robinson showed deliberate indifference to his safety. Tr.  00:18:30–00:19:00.

---

[6] The authenticated records do not include hospital records from this examination.

[7] At least in part, Keeter claims that those directly involved in his reclassification to G5—Sadler, Hudson, and Florida—did so because they hate men and are lesbian. Tr. 00:28:30–00:32:00. Notwithstanding this allegation, the Court notes that at the time of Keeter's *Spears* hearing, he was classified as G2 and living in the dorms again.

[8] Moreover, prisoners typically do not have a constitutionally protected right to a particular custody level. *Sanchez v. Allen*, 611 F. App'x. 792, 794 (5th Cir. 2015). And Keeter does not dispute that he tested positive for methamphetamines which resulted in the reclassification, but maintains that another inmate "spiked" his coffee sweetener with the drug unbeknownst to Keeter.

Keeter specifically complains of Sadler, Hudson, and Florida in connection with this claim. He does not allege personal involvement on the parts of Lumpkin, Monroe, or Sperry. Rather, Keeter's claims against the latter are more properly construed as failure-to-train claims and, as such, those claims are discussed below in section III.d.

To bring a failure to protect claim, a prisoner must plausibly demonstrate: (1) that he was incarcerated under conditions that posed a substantial risk of harm; and (2) that officials were deliberately indifferent to "a sufficiently substantial 'risk of serious damage to [the prisoner's] future health.'" *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (internal cites omitted).

"Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). Generally, a finding of deliberate indifference "must rest on facts clearly evincing 'wanton' actions on the parts of the defendants." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017) (quoting *Alton v. Tex. A & M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999)); *see also Farmer*, 511 U.S. at 837. And it "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001).

A prison official acts with deliberate indifference only when "he knows that inmates face a substantial risk of serious bodily harm" and "he disregards that risk by failing to take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

Thus, the prison official "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer*, 511 U.S. at 837.

A plaintiff does not need to show that a defendant knew of the specific harm that befell the plaintiff. *Id.* at 842. Instead, if a plaintiff presents evidence that there was a substantial risk of inmate attacks and that risk "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and can show that the defendant had been exposed to that information, then the plaintiff has stated a claim for failure to protect. *Id.* at 842–43.

The known risk cannot be just any risk but must be "excessive." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009). This is because "[p]rison officials are not . . . expected to prevent all inmate-on-inmate violence." *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003). Prison officials must guard against current threats, as well as sufficiently imminent dangers that may cause harm in the future. *See Horton v. Cockrell*, 70 F.3d 397, 400–01 (5th Cir. 1995) However, "[n]ot every injury suffered by one prisoner at the hands of another rises to the level of a constitutional violation." *Horton*, 70 F.3d at 400. And a prison official's "failure to alleviate a significant risk that [the official] should have perceived, but did not, is insufficient to show deliberate indifference." *Domino*, 239 F.3d at 756 (quoting *Farmer*, 511 U.S. at 838) (internal quotation marks omitted).

*1. Incarcerated under conditions that posed a substantial risk of harm*

Keeter testified at his *Spears* hearing that he and Robinson were "mismatched" as cellmates under the PREA standards and that those standards were not considered in

assigning him to a cell with Robinson. Tr. 00:06:40–00:11:30. Keeter argues that his sexual orientation and conviction for indecency with a child makes him more susceptible to being attacked by other inmates in general. *Id*. And he claims that Robinson specifically had a history of assaulting cellmates, including sexually. Tr. 00:15:00–00:15:45. Keeter testified that Robinson "stays high on K-2," is a "head honcho for the CRIPS" gang, and prison officials knew he was violent because all G5s are violent. *Id.*

Keeter claims that Sadler, Hudson, and Florida were required to review Robinson's record in making the cell assignment to ensure compatibility with Keeter, but they failed to do so. Tr. 00:20:30-00:21:40. Keeter admits that he does not know what Sadler, Hudson, and Florida reviewed in making the cell assignment, but testified that Robinson has a reputation for trouble in the prison, is known to start fights, and has been classified as G5 several times during his incarceration. Tr. 00:23:00-00:23:30. Keeter claims that Sadler, Hudson, and Florida knew that Keeter did not have any prison history of violence or assaultive behaviors, but that Robinson did. Tr. 00:26:30-00:26:40.

Keeter also testified that he has been incarcerated with TDCJ for over twenty years and that his charge for testing positive for methamphetamines was his first major disciplinary case. Despite this, upon being found guilty of the charge, he was reclassified from G2 to G5.

The Court's review of the authenticated appears to confirm certain aspects of Keeter's allegations, while also providing greater factual context for his claims. Specifically, the records confirm that:

- Keeter was classified as G2 until his 2019 reclassification to G5;

- ▪ Keeter had always been classified as G2 until his reclassification to G5 upon being found guilty of using methamphetamine;
- ▪ Keeter's disciplinary record reflects only two charges other than the one that resulted in his reclassification to G5, and those charges involved non-violent incidents of some form of misrepresentation to an officer and possession of contraband;
- ▪ Keeter's disciplinary record indicates that he has lost no good time due to his disciplinary violations;
- ▪ Robinson had been reclassified several times between G2 and G5, but has predominantly been classified toward the G4-G5 end of the spectrum;
- ▪ Robinson's disciplinary record indicates previous charges of: (a) possession of a weapon, (b) lying to staff, (c) damaging/destroying property, (d) twice fighting or assaulting an offender without a weapon with serious injury, (e) twice possessing contraband, (f) indecent/vulgar language or gesture, (g) refusing to attend school/complete assignments, and (h) trafficking/trading in goods; and,
- ▪ Robinson has lost a total of 2430 days of good time as a result of his infractions.

Accepting Keeter's well-pleaded allegations as true, he has pleaded enough facts to plausibly demonstrate that Keeter's assignment to a cell with Robinson, considering the context of their relative risk attributes, posed a substantial risk of harm to Keeter. Moreover, the risks alleged by Keeter appear to be greater than the risks inherent in merely being incarcerated. Moreover, as reflected in the authenticated records of Robinson's disciplinary history, the alleged risks plausibly fall in a category of risk that "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," *Farmer*, 511 U.S. at 842–43.

2.  _Deliberate indifference to a substantial risk of serious harm_

Having established the plausibility that Keeter was objectively exposed to a substantial risk of harm in being housed with Robinson, the Court turns to whether those involved in that decision were subjectively indifferent.

Keeter claims that being housed with Robinson created a substantial risk of being attacked because Robinson had a history of assaulting cellmates, including sexually. Tr. 00:15:00–00:15:45. When Keeter was questioned at his _Spears_ hearing about how he knew Robinson had a history of sexually assaulting cellmates, he testified that Robinson informed him of this after the first time Robinson assaulted him. _Id._; Tr. 00:19:00–:0019:45. Keeter was asked whether there were any other factual bases to support that Robinson had previously sexually assaulted other inmates. Tr. 00:19:00–00:19:30. Keeter testified that he was told by others "later on that [Robinson] was messing around with homosexuals." _Id._. Keeter does not claim to have known about Robinson's violent history prior to their assignment together.

Keeter insists that prison officials knew Robinson was violent because he was classified at the G5 custody level. Tr. 00:19:00–00:20:20. Keeter was specifically questioned at his _Spears_ hearing about what Sadler, Hudson, and Florida knew about Robinson prior to the assignment that would have made his assignment with Robinson unsafe. Tr. 00:21:00–00:22:05. Keeter testified that Sadler, Hudson, and Florida should have reviewed Robinson's record in making the assignment. _Id._; Tr. 00:26:45–00:27:00. But Keeter admits that he does not know what the prison officials reviewed or considered in assigning him with Robinson. Tr. 00:27:00–00:27:45. Nor does he know what

13

Robinson's record showed or whether it reflected a history of assaulting cellmates. *Id*. But he claims that Robinson's reputation in the prison was such that Sadler, Hudson, and Florida must have either known of Robinson's history or failed to perform the record review necessary to make a properly informed decision about the housing assignment. *Id*.

To establish that a prison official was subjectively aware of a substantial risk of serious harm to an inmate, a prisoner need not produce direct evidence of the official's knowledge. A prisoner may rely on circumstantial evidence indicating that the official must have known about the risk. *See Hope v. Pelzer*, 536 U.S. 730, 738–39 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."); *Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]"). When "an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Farmer*, 511 U.S. at 842–43.

Moreover, "'[d]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

Here, Keeter has alleged that Sadler, Hudson, and Florida were each members of the UCC and were involved in both his reclassification from G2 to G5 and his assignment to a cell with Robinson. Judicial experience and common sense suggest that those involved in setting custody levels and making cell assignments—here, allegedly Sadler, Hudson, and Florida—must have either familiarized themselves with the records and relative risk attributes of the inmates they are making decisions about, or should have.[9]

The existence of negligence as a plausible explanation for the harm alleged does not preclude the plausibility of deliberate indifference. And accepting Keeter's allegations as true, as the Court must here, gives rise to a set of circumstances that plausibly suggests these officials had been exposed to information in Robinson's reputation or record concerning the risk he posed to an inmate like Keeter. Thus, for purposes of preliminary screening, the Court concludes that Keeter has plausibly alleged that Sadler, Hudson, and Florida "must have known" about the risk.

For these reasons, Keeter's failure-to-protect claims against Sadler, Hudson, and Florida arising out of their involvement in assigning Keeter to the cell with Robinson survive screening, and they will be required to file an answer, motion, or other responsive pleading to the Complaint.

---

[9] The Court notes that PREA "does not create or provide a private cause of action" and any claims for relief premised on alleged violations of PREA must be dismissed for failure to state a claim. *Molina v. Wise Cnty., Tex.*, No. 4:17-cv-809-Y, 2019 WL 2176272, at *2 (N.D. Tex. May 20, 2019); *see also Krieg v. Steele*, 599 F. App'x 231, 232–33 (5th Cir. 2015) (per curiam) ("Insofar as Krieg argues that his rights under the… [PREA] were violated, other courts addressing this issue have found that the PREA does not establish a private cause of action for allegations of prison rape. Krieg has cited no case in support of his position; therefore, any claim raised under the PREA is properly dismissed as frivolous." (collecting cases)). But here, Keeter's allegations plausibly state a claim under the Eighth Amendment claim without the need to resort to PREA standards.

**b. Failure to protect in not immediately removing Keeter from the cell when he first reported sexual assault.**

On March 14, 2019, four days after the rapes stopped, around 4:00 a.m., Keeter claims that he wrote an I-60 that said, "I need help my celly sexually assaulted me," and waited for the officer to come by on his 4:00 a.m. count. Dkt. No. 1 at 10; Tr. 00:33:30–00:34:30. When Weaver came by on his rounds, Keeter gave him the I-60, told him that he had been assaulted by his cellmate, and needed to speak to the warden. But Weaver "took the note and left never to return." *Id*.; Tr. 00:34:00–00:39:00. As explained above, the authenticated TDCJ records identify Paul Weaver, Correctional Officer III, as the officer who was assigned as the roving officer in Keeter's cell wing at that time. Keeter's claim against Weaver is analyzed under the failure-to-protect standards set out above in Section III.a.

Keeter testified at his *Spears* hearing that he thought Weaver read his I-60 note, but Keeter was not certain. Tr. 00:34:00–00:34:45. Keeter later filed a grievance regarding Weaver's failure to immediately remove him from the cell and testified at his *Spears* hearing that in investigating the grievance, Captain Turner looked at the surveillance video for the time in question. Tr. 00:32:30–00:33:10. Keeter claims that Captain Turner told Keeter that he saw Keeter hand the officer something through the cell door. Keeter testified that Captain Turner was able to identify the officer and "called him up and chewed him out," but would not tell Keeter his name. *Id*.

16

The authenticated TDCJ records reflect that Weaver was interviewed as part of the investigation into Keeter's grievance related to this incident.[10] The records regarding that investigation reveal that:

> Offender Keeter was asked if he informed the officer his life was in endanger [sic] and he stated no. He stated he just handed him the I-60 and requested to speak to the warden. Offender Keeter admitted he never stated to the officer that his life was in danger. Offender Keeter alleged he thought the officer would read the I-60. Offender Keeter was informed it is against policy for staff member's [sic] to read offender's mail their only responsibility is to pick it up. Offender Keeter stated, "yea, I guess that makes sense."

The authenticated records further reveal Weaver's statement that Keeter "handed me what I assumed was a piece of mail and put with the other mail I had collected." The records include a statement that "Officer Weaver stated at no time did any offender state to him their life was in danger or voice to him they were having problems with their cellmate."

Keeter's factual allegations regarding whether he said anything to Weaver about having been assaulted and needing help—as opposed to silently handing Weaver the note—materially conflict with Weaver's account in the authenticated records. But the authenticated records reveal corroboration of Keeter's account of this episode from an ironic, if unlikely, source: Robinson. A Report of Interview of Robinson in the authenticated records reveals the following:

---

[10] The Court may consider reliable evidence when analyzing a prisoner's complaint, including authenticated prison records, and where the complaint is directly contradicted by those records, the Court may dismiss those claims as frivolous. *See Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical and other prison records if they are adequately identified and authenticated" (internal quotations omitted)). But such records "may not be used to resolve material disputed fact findings when they are in conflict with the pleadings or affidavits." *Ruiz v. Mercado*, Civ. A. No. M-14-1921, 2016 WL 1166040, at *2 (S.D. Tex. Feb. 10, 2016) (citations omitted), *rec. adopted*, 2016 WL 1162264 (S.D. Tex. Mar. 23, 2016).

Offender Robinson stated when the floor officer came to the cell to check into the commotion Offender Keeter whispered to the Officer to have been raped by his cellmate. Offender Robinson stated he was immediately upset because he overheard the allegation Offender Keeter had just made against him.

Accepting Keeter's factual allegations about this conversation as true, particularly in light of their corroboration by the authenticated records, and viewing those facts in a light most favorable to Keeter, the Court finds it plausible that Keeter not only passed a note to Weaver seeking help, but verbally informed him of his need for protection as well. Thus, it is plausible that Weaver knew that Keeter faced a substantial risk of serious bodily harm and disregarded that risk by failing to take reasonable measures to abate it.[11] *See Gobert,* 463 F.3d at 346; *Farmer,* 511 U.S. at 843.

For these reasons, Keeter's claim against Paul Weaver survives screening and Weaver will be required to file an answer, motion, or other responsive pleading to the Complaint.

**c. Failure to properly investigate allegations of sexual assault**

Keeter also brings a claim of failure to properly investigate the assaults against Warden Monte Griffin. Dkt. No. 1 at 5. Keeter claims that after he reported the assaults on March 14, 2019, and after returning from the hospital, he was placed in Administrative Segregation (Ad Seg) per TDCJ policy requiring a potential victim to be separated from his attacker. After being in Ad Seg for approximately two weeks, Keeter testified that he was taken to see Griffin, and Griffin told him, "Well I investigated this incident and didn't

---

[11] The Court notes that after Keeter handed the note to Weaver and allegedly spoke to him, Keeter remained in the cell for approximately two hours before being removed by the officers on the next shift. During those two hours, Keeter claims to have been slapped in the face four or five times by Robinson. Dkt. No. 1 at 10.

see any proof of this abuse occurring." *Id*. at 11. Keeter claims that Griffin "never obtained any of the medical records from the Hendricks Hospital." *Id*. Keeter also testified that he received a notice from OIG that the claims could not be substantiated. Tr. 00:50:30-00:51:33.

Keeter acknowledges that a referral to OIG was made, an investigation took place, and that Weaver was interviewed, and possibly reprimanded, in connection with the investigation. Tr. 00:32:30–00:33:10. But he is dissatisfied with the outcome of the investigation.

Any claim by Keeter regarding the manner in which Griffin or other prison officials investigated his grievance related to the assaults must be dismissed as frivolous. This includes any claim that Griffin denied Keeter due process by not investigating his grievance regarding the sexual assaults. It is well settled that prisoners do "not have a federally protected liberty interest in having [their] grievances resolved to [their] satisfaction," and an alleged Section 1983 due process violation for failure to investigate grievances is "indisputably meritless." *Hill v. Walker*, 718 F. App'x 243, 250 (5th Cir. 2018) (citing *Geiger*, 404 F.3d at 374)). The Fifth Circuit further stated that "an alleged violation of a prisoner's due process rights resulting from prison grievance procedures is a 'legally nonexistent interest.'" *Geiger*, 404 F.3d at 374.

Regardless of the lack of a right to certain procedures in prison grievances, the authenticated records show that prison officials did investigate Keeter's claims that he was sexually assaulted by Robinson. The fact that Griffin ultimately determined Keeter's claim to be unsubstantiated does not give rise to a viable legal claim. This is particularly true

where, as here, the outcry was not made until four days after the last assault and much of the evidence was potentially lost during that time. That Keeter's grievances failed to yield a result that was satisfactory to Keeter does not render the process constitutionally infirm. *See Hill*, 718 F. App'x at 250.

For these reasons, Keeter's claim against Griffin for failing to investigate the assaults must be dismissed for failure to state a claim upon which relief may be granted.

**d. Failure to properly train on (a) proper custody level classification and (b) preventing sexual assaults.**

Keeter brings claims of failure to properly train TDCJ staff against Lumpkin, Monroe, and Sperry. Dkt. No. 1 at 5. In support of this claim, Keeter testified that had the prison officials been properly trained, he would not have been assigned to a cell with Robinson. More specifically, Keeter claims that had the prison officials been trained in the application of the PREA standards, he would not have been harmed.

To state a claim for failure to train or supervise, a plaintiff must plead factual allegations showing that (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounted to deliberate indifference. *Gates v. Tex. Dep't of Protective & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008).

Keeter offers no direct evidence of a failure to train or deliberate indifference on the parts of Lumpkin, Monroe, or Sperry. He instead argues that assaults by fellow cellmates,

like the ones that happened to him, only occur in the absence of proper training. Thus, he urges, in effect, that an inference of supervisory failure is warranted in such circumstances.

As explained above, a prisoner may rely on circumstantial evidence of a risk that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," to establish deliberate indifference. *Hope,* 536 U.S. at 738–39; *Farmer*, 511 U.S. at 842. But Keeter fails to allege enough facts for this Court to conclude that there is a systemic problem within TDCJ regarding cellmate assignments. This is not to say that cellmate-on-cellmate violence within TDCJ never occurs. But the failures alleged on the parts of Sadler, Hudson, and Florida—if they occurred—appear to be failures of the individuals involved in Keeter's cell assignment, rather than an institutional failure. There are insufficient facts pleaded here from which the Court can reasonably infer or extrapolate to a larger problem. And generally, "[a] single incident, standing alone, is insufficient as a matter of law to establish a failure to train violation"; instead, a plaintiff must establish a pattern of similar incidents. *Craig v. St. Martin Par. Sheriff*, 861 F. Supp. 1290, 1302 (W.D. La. 1994); *see also Farmer*, 511 U.S. at 835 ("[A] single incident is usually insufficient to demonstrate deliberate indifference."). To establish deliberate indifference in this context generally requires that a plaintiff demonstrate at least a pattern of similar training failures "that is so clearly inadequate as to be obviously likely to result in a constitutional violation." *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003); *Thompson*, 245 F.3d at 459.

Here, Keeter's allegations relate to a single housing assignment decision, and any claims of a larger pattern of failing to properly train on custody level classifications and

preventing sexual assaults are conclusory and unsupported. Moreover, to the extent this claim is based on TDCJ's alleged departure from PREA standards, those standards do not give rise to a cause of action. *See Krieg,* 599 F. App'x at 232–33 (5th Cir. 2015).

Ultimately, Keeter has failed to allege in non-conclusory fashion a plausible pattern of harm caused by prison officials' failure to train on classification or cell assignments despite his incarceration with the TDCJ for over twenty years. *See Littell v. Valdez*, No. 3:15-CV-2362-D-BN, 2015 WL 10372433, at *5 (N.D. Tex. Nov. 20, 2015) (recommending dismissal of plaintiff's failure to train claim because he did not allege a pattern of harm from officer misconduct).

For these reasons, Keeter's claims for failure to train against Lumpkin, Monroe and Sperry must be dismissed for failure to state a claim upon which relief may be granted.

## IV.  CONCLUSION

### a.  Dismissed claims

For the foregoing reasons, the undersigned ORDERS as follows:

1. Keeter's claim against Monte Griffin for failing to investigate the assaults of March 8-10, 2019 is DISMISSED for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).

2. Keeter's claims for failure to train against Bobby Lumpkin, Gene Monroe, and Steven Sperry are DISMISSED for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).

With respect to the dismissal of Keeter's claims above, this is a consent case assigned to the undersigned United States magistrate judge under 28 U.S.C. § 636(c) with

authority to enter judgment. Dkt. No. 15. Any appeal of these dismissals must be to the Court of Appeals for the Fifth Circuit under 28 U.S.C. § 636(c)(3). Dismissal of these claims does not release Keeter or the institution where he is incarcerated from the obligation to pay any filing fee previously imposed. 28 U.S.C. § 1915(b)(1); *see also Williams v. Roberts*, 116 F.3d 1126, 1128 (5th Cir. 1997).

**b**. **Surviving claims**

It is further ORDERED that:

1.   Keeter's failure-to-protect claims against Karla Sadler, Crystal Hudson, and Michelle Florida arising out of their involvement in assigning Keeter to the cell with Robinson survive screening. Sadler, Hudson, and Florida must file an answer, motion, or other responsive pleading to the Complaint.

2.   Keeter's failure-to-protect claim against Paul Weaver for not immediately removing Keeter from the cell on the morning of March 14, 2019, survives screening. Weaver must file an answer, motion, or other responsive pleading to the Complaint.

It is yet to be determined whether Keeter will ultimately prevail on his surviving claims and the Court expresses no opinion as to the lawfulness of any of the actions of the Defendants who are required to file an answer, motion, or other responsive pleadings. Nothing in this Order constitutes an adverse finding as to the conduct of any such Defendant.

**c.  Documents to be provided to the Office of the Attorney General**

It appears that Defendants Karla Sadler, Crystal Hudson, Michelle Florida, and Paul Weaver are employees of the State of Texas and are likely to be represented by the Office

of the Attorney General for the State of Texas. It is, therefore, ORDERED that the Clerk of Court shall transmit to the Attorney General (1) a copy of this Order, (2) a copy of Keeter's Complaint, and (3) a Notice and Election Regarding Consent to Proceed Before a United States Magistrate Judge. These documents must be transmitted by e-mail to the appropriate e-mail addresses at the Office of the Attorney General for the State of Texas. *See* FED. R. CIV. P. 5(b)(2)(E).

**d**. **Time to file an answer, motion, or other responsive pleading**

It is ORDERED that Defendants Karla Sadler, Crystal Hudson, Michelle Florida, and Paul Weaver will each have **thirty (30) days** from the date of service of this Order within which to file an answer, motion, or other responsive pleading regarding Keeter's surviving claims. No further motions or pleadings may be filed by Keeter, other than an appeal of the dismissed claims, until after the Defendants have filed an answer, motion, or other responsive pleading, and the Court has entered its scheduling order. All discovery is stayed until further notice.

**e**. **Order for last known addresses of former TDCJ employees**

If Karla Sadler, Crystal Hudson, Michelle Florida, or Paul Weaver are no longer employed by the Texas Department of Criminal Justice and will not be contacted and represented by the Office of the Attorney General, it is ORDERED that the Assistant Attorney General assigned to this case must provide the Court with the former employee's last known address, **UNDER SEAL AND WITHOUT A MOTION**, on or before the date on which that Defendant's answer is otherwise due.

ORDERED this 8th day of November, 2022.


_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE