IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| JACKIE RUSSELL KEETER, <br> Institutional ID No. 935295, <br> SID No. 04000659, <br><br> Plaintiff, <br><br> v. <br><br><br> LORIE DAVIS, *et al.*, <br><br> Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | Civil Action No. 1:20-CV-00066-BU |

**<u>ORDER</u>**

Pro se Plaintiff Jackie Russel Keeter is serving a life sentence at TDCJ's Allred Unit. Keeter filed this civil action under 42 U.S.C. § 1983 complaining of events that occurred at TDCJ's Robertson Unit in Abilene, Texas. Dkt. No. 1. Following the judicial screening of Keeter's claims under 28 U.S.C. § 1915, the Court dismissed some claims, but ordered Karla Sadler, Crystal Hudson, Michelle Florida, and Paul Weaver to file an answer, motion, or other responsive pleading regarding Keeter's surviving claims. *See* Dkt. No. 27. Keeter has consented to the undersigned exercising the full jurisdiction of this Court. Dkt. No. 15.

Now before the Court is Keeter's Motion for a Temporary Restraining Order filed on February 17, 2023. Dkt. No. 48. Through this Motion, Keeter claims that because of identifying as a transgender woman, she is subjected to threats of sexual assault and beatings by other inmates and acts of retaliation by TDCJ employees due to her lawsuit in this Court. *Id.* The Court ordered the Office of the Attorney General (OAG) for the State

of Texas to file a response to the claims in Keeter's Motion, see Dkt. No. 50, which it did. Dkt. Nos. 52-54.

## I. FACTUAL BACKGROUND

Following the preliminary screening of Keeter's claims, Keeter's failure-to-protect claims against four defendants survived, and those defendants were ordered served. Dkt. No. 27. Her failure-to-protect claims arise from allegations of being repeatedly drugged and raped by her cellmate from March 8 to March 10, 2019. *Id.* at 7.

Through her current Motion, Keeter seeks "a temporary restraining order and a preliminary injunction to ensure that I am placed on safe keeping to prevent any further assaults. . . ." Dkt. No. 48-1 at 1. Keeter states that as a transgender woman currently housed at TDCJ's Allred Unit, she is "still the target of sexual assaults, sexual harassment, unwanted sexual harassments, and now extorsion [sic]." *Id.* Specifically, Keeter alleges that, "[o]n June 7, 2021; while working in the kitchen at the Allred Unit, Plaintiff was sexually groped by another inmate, by touching plaintiff on the butt." *Id.* Keeter claims that she reported the incident to the Safe Prisons officer through the grievance process, and was thereafter taken to see Major Murdock. *Id.* Keeter states that "Murdock had Plaintiff locked up for her safety while the matter was investigated." *Id.* at 2. After being locked up for seven days, Keeter was informed by the Unit Classification Committee (UCC) that her allegations were "unsubstantiated," and that she would be returned to general population. *Id.*

Keeter complains that the alleged perpetrator of the June 7 assault was also released from lock up at the same time, "which caused the perpetrator to rally other Crip gang

members around him, to jump on plaintiff." *Id.* Keeter acknowledges that she "was placed back in population with a good cell partner, but she is constantly given notes by other offenders asking for sexual favors, or ask face to face to go into showers, or other inmates will expose their private parts to plaintiff, or even go as far, as look out of their cell door and masterbate [sic] on plaintiff." *Id.*

Keeter refers to several other alleged assaults while in TDCJ custody, including the alleged March 2019 assault which forms the basis for this action, as well as an alleged extortion-related beating in 2002. *Id.* Ultimately, Keeter concludes that "[i]t is not safe for Transgenders to live in this prison population, because the administration allows them to smoke K-2, snort bath salts, or snort or shoot methamphetamine in the dayrooms all day long, in direct view of the cameras." *Id.* at 3.

Keeter also alleges that since Defendants have found out that Keeter was suing them, she has been subjected to acts of retaliation from the prison officials. *Id.* at 4. Keeter claims that an Officer Wydell searched her cell claiming he smelled smoke but told Keeter's "celly" that "we are after him." *Id.* at 4. Keeter claims this same officer "stepped out of . . . [her] cell and in a loud voice, screamed 'OH YOU SAY THAT 20 CELL HAS ALL THE DOPE.'" *Id.* Keeter says that Wydell found out Keeter "was good at the law" and has since been having Sgt. Vasquez retaliate against and harass her. *Id.*

One act of retaliation or harassment discussed by Keeter is when Vasquez and other officers claimed Keeter's cell was on the "shake down list," when Keeter claims it was not. *Id.* at 5. While searching Keeter's cell, Keeter claims officers took an "Order from this Court" and letters proving that Keeter was being sexually harassed. *Id.* Keeter says that

3

after the officers took the letters, Vasquez allowed an inmate "to fall out of place and confront" Keeter about one of the letters. *Id.* And according to Keeter, Vasquez was reading the letters out loud to other inmates after taking them. *Id.*

In another example, Keeter claims that she had to speak with Captain Ferris after Vasquez showed Ferris pants that Keeter had altered. *Id.* at 5–6. Keeter explained to Ferris that the alterations were for her own use, not to sell the pants to other inmates, which Ferris believed. *Id.* Lastly, Keeter claims that Vasquez and Wydell were telling other inmates that they were being tested for Meth because Keeter "was caught with several kites from other inmates talking about drugs and it is . . . [Keeter's] fault." *Id.* at 6. Keeter claims that her "life is in danger from Vaquez and Wydell," and that "They are trying to roll me either to 7 building which is G-4 or 8 Building which is G-5." *Id.* Keeter believes that once at buildings 7 or 8 Vasquez and Wydell "will have other Correctional Officers to get inmates to attack me." *Id.*

The OAG's response to Keeter's Motion consists of three exhibits. Dkt. No. 53. Exhibit A is a copy of the investigation conducted into the claims made by Keeter through her Motion. Dkt. No. 54 at 1-13. Exhibit B is a copy of Keeter's TDCJ classification file reflecting her Unit Classification history and review, as well as her Safe Prisons/PREA investigations. Dkt. No. 54-1 at 1-93. And Exhibit C includes copies of relevant grievances filed by Keeter as taken from his grievance file. Dkt. No. 54-2 at 1-91.

The investigation records provided by the OAG reveal that the TDCJ investigated the allegations contained in Keeter's Motion, during which Keeter was interviewed by Lt. C. Young. Dkt. No. 54 at 2. Keeter was specifically asked by Young about her allegations

4

of physical and sexual assault and reportedly responded that those allegations had "been addressed in an inmate protection investigation" which could be "found on the Safe Prison/PREA Automated Network System (SPPANS). . . ." *Id.* The TDCJ investigation records further reveal that the investigation into Keeter's allegations was conducted by JA Safe Prison's Office Officer P. Brown, that the UCC reviewed the investigation, but was "unable to substantiate the allegation," but did add to Keeter's record, at her request, that Keeter identifies as transgender. *Id.* Keeter's allegations of retaliation by staff are still under investigation, but thus far have uncovered no "current findings to support his allegation." *Id.*

According to the TDCJ records provided with the OAG response, Keeter has been in general population since his incarceration in 2000. *Id.* Regarding the safety of transgender inmates, TDCJ reports that:

> Inmates identified as transgender are reviewed by the UCC twice annually, Semi-annual Reviews for Special Populations. During these reviews inmates are asked specific questions to determine if they are experiencing any safety issues because of their trans gender or intersex status. Inmate Keeter's most recent special population review was held on 12/01/2022 in which the 3 questions were asked with the following responses.
>
> 1. Since your last review, has anyone solicited, pressured, or forced you to engage in sexual acts? NO
> 2. Have you experienced sexual harassment by others? NO
> 3. Do you currently feel safe in your present housing, work, and program assignment? YES
>
> Although an inmate may have one or more of the examples of the factors UCC can look at when determining if placement in safekeeping is warranted, it does not necessarily mean placement should be recommended. The decision for placement is ultimately based on good sound correctional judgement based on an inmates current & past situations as well as the totality of his record.

> In my opinion Inmate Keeter has not met the need for placement in safekeeping. Being identified as transgender in itself does not warrant placement. He has served over 24 years in general population, he is not small in stature, does not appear weak in nature nor effeminate, and has been able to manage many years while in general population with minimum issues reported.
>
> In conclusion, Inmate Keeter was interviewed not only recently during his semi-annual special population review but also by Lt. Young on 3/02/2023. Inmate Keeter stated he has not had any issues since the last incident which was investigated in June of 2021. Inmate Keeter will be seen again for another semi-annual special population review in June 2023.

*Id.*

## II. LEGAL STANDARDS

"An injunction is an extraordinary remedy and should not issue except upon a clear showing of possible irreparable injury." *Lewis v. S.S. Baune*, 534 F.2d 1115, 1121 (5th Cir. 1976). A party seeking a preliminary injunction or temporary restraining order must prove four elements:

1. a substantial likelihood of success on the merits of her case;
2. a substantial threat that the plaintiff will suffer irreparable injury;
3. that the threatened injury outweighs any harm that the injunctive order might cause the defendant; and
4. that the injunction is in the public interest.

*Women's Med. Ctr. v. Bell*, 248 F.3d 411, 419, n.15 (5th Cir. 2001).

Injunctive relief will be denied if the movant fails to prove any of these four elements. *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). In the prison context, courts should exercise great caution when considering injunctive relief. *Bell v. Wolfish*, 441 U.S. 520, 547–48, 562 (1979)

(recognizing the wide-ranging deference given to prison administrators to maintain institutional security and warning courts against becoming "enmeshed in the minutiae of prison operations"). When a plaintiff requests injunctive relief that would require the court to interfere with the administration of a state prison, "appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." *Rizzo v. Goode*, 423 U.S. 362, 379 (1976). Principles of equity militate heavily against granting injunctive relief except in the most extraordinary circumstances. *Id*.

### III. ANALYSIS

1. *Substantial likelihood of success on the merits of Keeter's case*

   a. Failure-to-protect

   Keeter's current Motion alleges facts that are in the vein of a failure-to-protect claim and claims of retaliation. To bring a failure to protect claim, a prisoner must plausibly demonstrate: (1) that she was incarcerated under conditions that posed a substantial risk of harm; and (2) that officials were deliberately indifferent to "a sufficiently substantial 'risk of serious damage to [the prisoner's] future health.'" *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (internal cites omitted).

   "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). Generally, a finding of deliberate indifference "must rest on facts clearly evincing 'wanton' actions on the parts of the defendants." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d

7

415, 420 (5th Cir. 2017) (quoting *Alton v. Tex. A & M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999)); *see also Farmer*, 511 U.S. at 837. And it "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001).

A prison official acts with deliberate indifference only when "he knows that inmates face a substantial risk of serious bodily harm" and "he disregards that risk by failing to take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Thus, the prison official "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer*, 511 U.S. at 837.

A plaintiff does not need to show that a defendant knew of the specific harm that befell the plaintiff. *Id.* at 842. Instead, if a plaintiff presents evidence that there was a substantial risk of inmate attacks and that risk "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and can show that the defendant had been exposed to that information, then the plaintiff has stated a claim for failure to protect. *Id.* at 842–43.

The known risk cannot be just any risk but must be "excessive." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009). This is because "[p]rison officials are not . . . expected to prevent all inmate-on-inmate violence." *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003). Prison officials must guard against current threats, as well as sufficiently imminent dangers that may cause harm in the future. *See Horton v. Cockrell*, 70 F.3d 397, 400–01 (5th Cir. 1995) However, "[n]ot every injury suffered by one prisoner at the hands of

another rises to the level of a constitutional violation." *Horton*, 70 F.3d at 400. And a prison official's "failure to alleviate a significant risk that [the official] should have perceived, but did not, is insufficient to show deliberate indifference." *Domino,* 239 F.3d at 756 (quoting *Farmer*, 511 U.S. at 838) (internal quotation marks omitted).

Keeter has failed to demonstrate through her TRO Motion that there is a substantial likelihood that she will be successful on the merits of her current failure-to-protect claims. Keeter does not provide sufficient evidence showing that she has been subjected to continuous sexual assault and sexual harassment by other inmates. *See generally* Dkt. No. 48. The fact that Keeter identifies as transgender and believes that "It is not safe for Transgenders to live in this prison in population," is not enough to show her claims will be successful on the merits. *Id.* at 3.

The evidence presented through the OAG's response contradicts Keeter's allegations that TDCJ officials are acting with deliberate indifference to her health and safety. Specifically, the OAG has submitted evidence that TDCJ is actively investigating Keeter's complaints and applying the relevant protocols and policies. Rather than demonstrating that TDCJ officials were aware of and ignored any risk of substantial harm to Keeter, the available evidence instead reflects that TDCJ officials took steps to address Keeter's complaints and is monitoring potential risks of harm to Keeter. Keeter has failed to submit evidence to plausibly suggest that she is currently at substantial risk of serious harm or that TDCJ officials are aware of a risk of such harm but are failing to take steps to abate it.

b. Retaliation

"To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006) (quoting *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998)). Retaliation is actionable only "if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Id.* at 686.

The Fifth Circuit has recognized that "[t]he prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). "Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Id*. Thus, prisoners' claims of retaliation should be "carefully scrutinized by the courts." *Adeleke v. Fleckenstein*, 385 F. App'x 386, 387 (5th Cir. 2010) (citing *Woods*, 60 F.3d at 1166).

Conclusory allegations, including a prisoner's personal belief that he is the victim of retaliation, are insufficient to support a claim for retaliation. *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999) (citing *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997)). Instead, "[t]he inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred." *Haddix v. Kress*, 203 F. App'x 551, 554 (5th Cir. 2006) (quoting *Woods*, 60 F.3d at 1166).

The events discussed by Keeter fail to show that Keeter would be successful in bringing a claim for retaliation. Keeter does not provide sufficient facts from which this Court can conclude that Wydell's search of her cell was done with the intent of retaliating against Keeter for the filing of this lawsuit. Dkt. No. 48 at 4. And although Keeter claims that Wydell screamed outside Keeter's cell saying that Keeter had "dope," the OAG's response shows that these allegations had conflicting testimony. *See* Dkt. No. 54-2 at 184. Keeter claims that Wydell "backed off" upon discovering that Keeter is good at the law but believes he began to indirectly, through Vaquez, continue to retaliate against her. *Id.* at 4–5. However, Keeter does not set forth any evidence, aside from her own subjective belief, that Wydell was responsible for any of the acts committed by Vasquez.

Keeter fails to explain how she knows that Vasquez's acts including: taking letters from his cell, reading the letters to other inmates, allowing another inmate to confront Keeter about a letter, and telling Ferris that Keeter was altering her pants, are acts of retaliation against Keeter for exercising her constitutional rights. *Id.* at 5–6. Keeter's conclusion that Wydell decided to "lay-low" and have "his side kick SRGT Vasquez . . . start retaliating" against her and harassing her is not sufficient for this Court to conclude that any of Vasquez's acts, even assuming they all occurred, were in retaliation for Keeter exercising her rights. *Id.* at 5. Ultimately, Keeter's allegations of retaliation are conclusory and lack evidence showing specific intent to retaliate against Keeter for this lawsuit.

For these reasons, Keeter fails to establish at this time a substantial likelihood of success on the merits of her TRO Motion's failure-to-protect and retaliation claims.

2. *Substantial threat of irreparable injury*

    a. <u>Failure-to protect</u>

After review of the information provided by Keeter and the OAG, the Court does not find that there is a substantial threat of irreparable injury. Keeter claims to have been "sexually assaulted on three separate occasions, sexually harassed on a daily basis, and almost beat to death by the Aryan Brothers in 2002." Dkt. No. 48-1 at 2. Keeter claims that if not placed on safekeeping, she will continue to be threatened with irreversible sexual diseases, sexual harassment, sexual assault, and the threat of having property stolen. *Id.* at 2–3.

The OAG claims that, as required for all transgender inmates, Keeter was asked questions about her safety in general population in December of 2022, and Keeter claimed not to be experiencing sexual harassment. Dkt. No. 50. Additionally, the OAG points out that in the twenty-four years Keeter has been in the general population, incidents have been minimal. *Id.*

Although Keeter says she is sexually harassed daily, she provides no evidence to support this allegation. Without question, Keeter's claims of sexual harassment such as receiving notes from other inmates "asking for sexual favors," being groped, inmates exposing themselves to Keeter, and inmates masturbating at Keeter's cell door, are concerning. Dkt. No. 48 at 5. But when these claims are considered in relation to the 24 years Keeter has spent predominantly in general population, they fail to rise to the level of showing the extraordinary circumstances necessary to justify a preliminary injunction.

Additionally, the evidence that the OAG provided shows that investigations of many of Keeter's allegations have failed to reveal evidence of sexual harassment. Dkt. No. 50.

Keeter also claims that she has been sexually assaulted three times and beat up by Aryan brothers. Dkt. No. 48-1 at 2. One of these alleged assaults formed the basis for Keeter's underlying action in this Court. Dkt. No. 48 at 2. Additionally, Keeter makes allegations of being beat by inmates or having her property stolen by inmates. *Id.* at 3. While these claims are concerning, aside from the assault underlying this action, Keeter provides no evidence of these occurrences. The Court cannot accept these allegations as true, or rely upon them to issue a preliminary injunction. And any harm Keeter has been subjected to over the course of twenty-four years because of specific inmates or gang affiliated groups does not support Keeter's conclusion that every inmate residing in general population poses a threat of irreparable harm to Keeter.

b. Retaliation

As far as Keeter's allegations of retaliation, Keeter has similarly failed to show a substantial likelihood of irreparable injury. Keeter is not at risk for irreparable harm because she is being subjected to "shake downs." Even if some of her property is being seized, this has not prevented Keeter from having access to the courts, as made evident by her recent filings. *See* Dkt. Nos 48, 51, 55. Importantly, Keeter claims that Wydell has "backed off" because "he has been in so much trouble." *Id.* at 4.

The only claims Keeter makes that indicate a potential of harm are her claims that Wydell and Vasquez are attempting to have other inmates attack her. However, based on the information provided in Keeter's Motion, none of the confrontations she has had with

other inmates because of Wydell and Vasquez has resulted in any harm to Keeter. Dkt. No. 48 at 4–6. It seems that other inmates have only confronted, rather than harmed or threatened, Keeter. Additionally, Keeter's request to be moved to safekeeping would not prevent Keeter from engaging with the general population, which according to Keeter subjects him to potential harm.[1] *Id.* at 1.

For these reasons, the Court finds that Keeter's claims of irreparable harm are speculative at best, and there is no indication that she is currently at risk of imminent injury in connection with either her current allegations of failure-to-protect or retaliation.

3. *Whether the threatened injury outweighs any harm that the injunctive order might cause*

The threatened harms raised by Keeter falls short of the extraordinary circumstances that would justify this Court issuing an injunctive order to the Allred Unit and becoming enmeshed in the minutiae of managing that prison. The OAG outlined specific standards used when determining whether an inmate is in need of safekeeping and determined that these factors do not weigh in favor of placing Keeter in safekeeping. Dkt. No. 50.

And while Keeter may desire to be transferred to another prison, or have a particular custodial level or security classification, she is not entitled to these things on the facts alleged. Keeter claims that the only suffering involved will be taking her "to safe keeping" which is located within the Unit and will be "no more than business as usual." Dkt. No. 48 at 4. This downplays the importance of classifications within the prison system and the

---

[1] *Definitions & Acronyms*, TDCJ https://www.tdcj.texas.gov/definitions/index.html (last visited Mar. 22, 2023) ("Safekeeping inmates go to work, school, and other activities with general population inmates.").

caution that courts must use in determining whether to involve themselves in prison administration.

The decision to place inmates in safekeeping implicates considerations of institutional security and prison administration. And "[p]rison officials must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status." *Wilkerson v. Maggio*, 703 F.2d 909, 911 (5th Cir. 1983) (quoting *McGruder v. Phelps*, 608 F.2d 1023, 1026 (5th Cir. 1979)). This includes placement in ad-seg or changes in custodial classifications because of a disciplinary infraction. *Allums v. Phillips*, 444 F. App'x 840, 841 (5th Cir. 2011). A prisoner wishing to invoke due process protections in relation to her custody status must demonstrate that status change he complains of involves an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. Keeter has made no such showing here.

Similarly, the threatened injuries from Keeter's retaliation allegations are outweighed by the disruption that would occur if this Court took it upon itself to scrutinize the details of how the TDCJ officials discharge their most basic duties." See *Woods,* 60 F.3d at 1166.

4. *Whether the injunction is in the public interest*

Keeter claims that this injunction will serve the public interest "because it is always in the public interest for prison officials to obey the law." Dkt. No. 48 at 5. This does not show that granting the requested injunction is within the public interest. "Considerations of federalism weigh heavily against interference by federal courts through the issuance of preliminary injunctions against state agencies." *Denby v. Bosco*, No. 6:15CV876, 2016 WL

15

11201638, at *2 (E.D. Tex. Nov. 14, 2016). To grant Keeter an injunction and to require prison administrators to place Keeter in safekeeping, or to otherwise micromanage every interaction between Keeter and the TDCJ officials for fear of a retaliation claim, without Keeter showing extraordinary circumstances is not within the public interest. The OAG has shown that Keeter's allegations are being investigated and her safety monitored.

## IV.  CONCLUSION

For these reasons, Keeter's Motion for a TRO (Dkt. No. 48) is DENIED.

ORDERED this 21st day of March, 2023.

_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE