IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

JACKIE RUSSELL KEETER,  §
Institutional ID No. 935295  §
§
Plaintiff,  §
§
v.  §    Civil Action No. 1:20-CV-00066-BU
§
KARLA SADLER,[1]  §
§
Defendants.  §
§

## FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Inmate Jackie Russell Keeter brings this failure-to-protect claim against Karla

Sadler, a Texas Department of Criminal Justice (TDCJ) supervisor. *See* Dkt. No. 66.

Sadler invoked qualified immunity, Dkt. No. 70 at 2, and after limited discovery at

Sadler's request, Sadler filed her Motion for Summary Judgment (the Motion). Dkt.

No. 89. For the reasons below, the undersigned recommends the Motion be GRANTED.

## I.    JURISDICTION

The Court has subject-matter jurisdiction of this § 1983 claim under 28 U.S.C.

§ 1331. Venue is proper in the Abilene Division because the events giving rise to Keeter's

claims occurred in this division. *See* Dkt. No. 66. This pro se prisoner civil rights case was

---

[1] Karla Sadler, Crystal Hudson, Michelle Florida, and Paul Weaver were the only defendants ordered to answer or respond to Keeter's claims. Keeter later dismissed her claims against Weaver through her Amended Complaint, Dkt No 66, and dismissed her claims against Hudson and Florida through a joint stipulation. Dkt. No. 85.

1

transferred to the undersigned under 28 U.S.C. § 636(b) for preliminary screening. Dkt. No. 8.

## II.    FACTUAL BACKGROUND

Keeter was repeatedly raped by a cellmate in March 2019 at TDCJ's Robertson Unit.[2] Dkt. No. 66 at 1–2. Keeter is a transgender woman who identified at the time of the assaults as bisexual, but she was not openly female or transgender. *Id*. at 2. She has been incarcerated in TDCJ for over 20 years, most of that time as a General Population Level 2 (G2) inmate.[3] *See* Dkt. No. 94 at 102, 107. Also most of that time, she also identified as either bisexual or transgender.[4] Dkt. No. 66 at 4; Dkt. No. 91 at 8–10; Dkt. No. 92 at 5.

Keeter's G2 custody classification level reflected, among other factors, that she had little disciplinary history. Until 2019, her only prior charges were for two "minor" infractions.[5] Dkt. No. 94 at 105. But on February 20, 2019, that changed. *Id*. On that date, Keeter

---

[2] Keeter is currently assigned to TDCJ's Allred Unit near Wichita Falls. Dkt. No. 66 at 2.

[3] TDCJ's Offender Orientation Handbook states that "General population Level 2 (G2) or (J2) custody refers to offenders who may live in dorms or cells inside the security fence [and] may work outside the security fence under direct armed supervision. *See* TDCJ Director of the Correctional Institutions Division, *TDCJ Offender Orientation Handbook,* https://www.tdcj.texas.gov/documents/Offender_Orientation_Handbook_English.pdf (last visited February 12, 2025). Under Fed. R. Evid. 201, a court may *sua sponte* take judicial notice of facts "not subject to reasonable dispute" at any stage of the litigation. Fed. R. Evid. 201(b), (c); *Brown v. Lippard,* 472 F.3d 384, 387 (5th Cir. 2006). Accordingly, the undersigned takes judicial notice of the TDCJ *Offender Orientation Handbook*.

[4] Keeter's testimony is conflicting on when she started identifying as bisexual and transgender. She initially testified that at the time of the assaults, she identified as bisexual, but not transgender. *See* Dkt. No. 91 at 9. Moments later, she testified that she had identified with TDCJ as both bisexual and transgender since entering TDCJ. *See id*. at 10.

[5] Disciplinary charges are classified as either minor or major based upon a senior correctional officer's assessment of the nature and seriousness of the offense, the inmate's disciplinary history, and the amount of time since the inmate's last infraction. *See supra n. 3,* TDCJ *Disciplinary Rules and Procedures for Inmates*.

was charged and later convicted for her first major disciplinary infraction—use or possession of marijuana or an unauthorized controlled substance—after she tested positive for methamphetamines. *Id.*; Dkt. No. 66 at 5.

Inmates convicted of a major disciplinary infraction, as Keeter then was, are subject to a variety of penalties, including a reduction in custody classification level. Dkt. No. 91 at 60. This requires them to go before the Unit Classification Committee (UCC), a panel of three rotating officers who reclassify inmates who have been convicted of a major disciplinary infraction. *Id.* A UCC comprised of Sadler, Hudson, and Florida reclassified Keeter from G2 to G5.[6] *Id.*; Dkt. No. 66 at 5.

After an inmate has been reclassified, the next step is for the inmate to be reassigned to a building and cell corresponding to the reassigned custody level, *e.g.*, from a G2 building to a G5 building. This is done through the Count Room, which is responsible for making housing reassignments after an inmate is reclassified to a different custody classification level. Dkt. No. 91 at 16–18, 46–47, 53–58, 63–70, 108–14, 134–48; Dkt. No. 90 at 13. The Count Room and its staff are supervised by the Chief of Classification. *Id.*

The summary judgment evidence establishes that among the factors considered by the Count Room in making housing assignments are the inmate's age, weight, height, disciplinary record, work restrictions, housing restrictions, bunk restrictions, and whether there had been previous conflict between the two inmates. Dkt. No. 91 at 135–37, 145. The

---

[6] The TDCJ *Offender Orientation Handbook* states that G5 custody "refers to offenders who have assaultive or aggressive disciplinary records . . . G5 or J5 custody offenders shall live in cells [and] may not work outside the security fence without direct, armed supervision."

Count Room also considers which cells have a vacancy. *Id.* at 16.

The parties agree that once the Count Room makes a housing reassignment, a major or higher-level officer must authorize the move of the inmate to the new building and cell. This is done through signing a "move slip," an example of which is shown below:



*Id.* at 181 (exemplar). As shown, move slips are small pieces of paper which reflect only basic facts about the move, including the inmate's name, race, former housing assignment, and new housing assignment. *Id.* The move slip does not contain any information about the reassigned inmate's new cellmate. *Id.* at 136.

The move slip is signed by a member of the Count Room staff and then forwarded to the duty major for final approval. *Id.* at 135, 148. Sadler, as a major, had the authority to

4

sign move slips. *Id.* at 46. Although not definitively established by the evidence, it is presumed that Sadler signed Keeter's move slip. *Id.* Unknown to Sadler at the time, the Count Room staff had assigned Keeter to a cell with Victor Robinson after determining there were no compatibility issues between the two inmates. *Id.* at 68; Dkt. No. 90 at 13.

By 2019, Robinson had been incarcerated by TDCJ for most of the preceding 30 years. Dkt. No. 94 at 109. During that time, he accumulated over 80 disciplinary infractions, more than half of which were major infractions, some involving inmate-on-inmate violence. *Id.* at 4–12. During the two years before being housed with Keeter, Robinson had been reclassified multiple times between G2 and G5. *Id.* at 115. At the time of Keeter's reassignment, Robinson was serving a 90-day reclassification from G4 to G5 after being convicted for the major infraction of possessing a weapon. *Id.* at 113. The weapon was "a 6 inch metal rod sharpened to a point with a homemade handle on the opposite end." *Id.* at 15.

Keeter and Robinson began celling together on February 28. For the first week, nothing significant happened between the two cellmates. But on Friday, March 8, Keeter alleges that Robinson began drugging and raping her repeatedly over the next three days. Dkt. No. 91 at 10–12. It all started when Robinson began asking Keeter if she was bisexual. *Id.* at 10. Up to that point, Keeter did not think Robinson knew of her bisexuality and was "startled" when Robinson asked about it. *Id.* Keeter avoided Robinson's questions, but claims Robinson later poured a "white looking powder" into Keeter's coffee and ordered her, "Drink it or I'm gonna beat the hell out of you." *Id.* at 11. Keeter drank the coffee and "started to feel funny," after which Robinson raped her the first time. *Id.*

5

Keeter claims that Robinson drugged and raped her at least nine times from March 8 to March 10. *Id*. at 10–11. Robinson also used threats to keep Keeter quiet, telling her that if she did not keep her mouth shut, Robinson would have his "crip home-boys kill [Keeter's] pretty little white daughters." *Id*. at 11; Dkt. No. 66 at 7. Keeter alleges that Robinson beat her each time she attempted to resist, and that he told other inmates that they could rape Keeter in exchange for providing Robinson with "K-2 dope," although that apparently never happened. Dkt. No. 66 at 7. The rapes by Robinson stopped after March 10 because, Keeter says, Robinson ran "out of K-2 dope." *Id*.

On March 14 at 4:00 a.m., four days after the rapes stopped, Keeter first reported the assaults to prison officials through an I-60—or Inmate Request for Official Action. *Id*.; Dkt. No. 91 at 13. Keeter claims that, because the attacks occurred over a weekend, no officers came by for her to notify sooner. Dkt. No. 91 at 11. Keeter wrote on the I-60, "I need help my celly sexually assaulted me." *Id*. at 13; Dkt. No. 66 at 7. Keeter handed the I-60 to an officer on rounds and a sergeant was eventually summoned. Dkt. No. 91 at 13–15; Dkt. No. 66 at 8. Keeter was removed from the cell, taken first to the infirmary, and then to the hospital where a nurse examined her and, Keeter claims, observed bruises consistent with being sexually assaulted.[7] Dkt. No. 91 at 13–15; Dkt. No. 66 at 8.

### III.    PROCEDURAL BACKGROUND

Keeter sued several TDCJ officers, alleging they violated her constitutional rights.

---

[7] Neither the summary judgment evidence nor the authenticated records include hospital records from this examination.

*See* Dkt. No. 1. The Court found that Keeter's failure-to-protect claims against Sadler, Hudson, and Florida survived preliminary screening, Dkt. No. 27, and appointed counsel for Keeter, Dkt. No. 61. Keeter then filed an Amended Complaint. Dkt. No. 66. Although the Court ordered briefing on qualified immunity, Dkt. No. 71, the Defendants elected to first proceed with discovery, Dkt. No. 74, and the Court entered a Scheduling Order, Dkt. No. 76. Keeter later stipulated to the dismissal of claims against Hudson and Florida, Dkt. No. 85, and Sadler then filed her Motion for Summary Judgment based on qualified immunity. Dkt. No. 89.

## IV.    LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020). The moving party "bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (cleaned up). The moving party may "identify those portions of [the record] which it believes demonstrate [that] absence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In evaluating a summary-judgment motion, the Court draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). However, "the mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). An issue is "genuine" if "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id. at 248* (as cited by *Jones*, 936 F.3d at 321). "[A] fact is 'material' if its resolution could affect the outcome of the action." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (citation and quotation marks omitted).

Once the movant has satisfied this burden, the burden shifts to the nonmovant to demonstrate that a genuine issue of material fact does exist and that the evidence, viewed in favor of the nonmovant, permits a jury verdict for the nonmovant. *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020). The nonmovant must "go beyond the pleadings" and produce evidence showing that there is a genuine issue of fact. *Celotex*, 477 U.S. at 324. However, the non-moving party cannot overcome its burden by merely alleging legal conclusions or unsubstantiated assertions; instead, it must present affirmative evidence that supports the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586 ("[T]he purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial").

The Court must consider materials cited by the parties, but it may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3). Nevertheless, Rule 56 does not impose a

duty on the Court to "sift through the record in search of evidence" to support the non-movant's opposition to the motion for summary judgment. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16, n.7 (5th Cir. 1992)).

The undersigned begins with whether Sadler violated Keeter's constitutional rights.

## V.    ANALYSIS

### A. Violation of a Constitutional Right: Supervisory Liability for Failure-to-Protect Claims

The Supreme Court first recognized an Eighth Amendment failure-to-protect claim in *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). There, the Court expressly endorsed what it described as the uniform holdings of lower courts that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id*. at 833 (internal citations omitted). Although obvious, "gratuitously allowing the beating or rape of one prisoner by another serves no "'legitimate penological objective[.]'" *Id*. (quoting *Hudson v. Palmer*, 468 U.S. 517, 548 (1984)). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offense against society.'" *Id*. (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

But not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability . . .." *Id.* at 834. Rather, to succeed on a failure-to-protect claim, "the inmate must show that he [was] incarcerated under conditions posing a substantial risk of serious harm" and that the prison officials acted with 'deliberate indifference' to the inmate's safety." *Johnson v. Johnson*, 385 F.3d 503, 524 (5th Cir. 2004) (quoting *Farmer*,

511 U.S. at 834). The risk of assault cannot be just any risk but must be "excessive." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009). This is because "[p]rison officials are not . . . expected to prevent all inmate-on-inmate violence." *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003).

The requirement for subjective indifference on the part of the prison official reflects the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)) (internal quotation marks omitted). Thus, "[a]n official is deliberately indifferent when he 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Johnson*, 385 F.3d at 524 (quoting *Farmer*, 511 U.S. at 837).

"Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). Thus, "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017) (quoting *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999)).

Supervisors can also be liable for deliberate indifference. But because personal involvement is an essential element of a § 1983 claim, *see Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992), Sadler, as a supervisor, can be liable only for her own misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("In a § 1983 suit or a *Bivens* action . . . the

term 'supervisory liability' is a misnomer [and] [a]bsent vicarious liability, each Government official . . . is only liable for his or her own misconduct.").

Absent personal participation, a supervisory official can be liable only if she implements a policy "so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Thompkins v Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (internal citation and quotation marks omitted); *see also Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). To establish that a supervisor acted with deliberate indifference through a policy, a plaintiff must show that the supervisor had "actual or constructive notice" of the need to create or change a policy. *Porter*, 659 F.3d at 447. Generally, this "requires that a plaintiff demonstrate at least a pattern of similar violations." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005). When a plaintiff cannot show a pattern, the plaintiff must prove that the "specific injury suffered" was a "highly predictable consequence" of the supervisor's "failure to implement a policy." *See Hutcheson v. Dall. Cty.*, 994 F.3d 477, 482 (5th Cir. 2021).

**B. Discussion**

1. <u>Substantial risk of serious harm</u>:

Sadler argues there was no substantial risk of serious harm to Keeter because risk and harm "can only be inferred from current threats or 'sufficiently imminent dangers' that are likely to cause harm in the 'next week or month or year." Dkt. No. 90 at10. She asserts that "[t]here was nothing in the records [reviewed by the Count Room] to suggest that Robinson was a predator or that Keeter was [] weak-natured or had feminine or other unusual characteristics." *Id*. at 10–11. "Keeter's classification screen did not show that [she]

was transgender," nor did TDCJ files reflect that either inmate had a gang affiliation. *Id.* at11. "Both inmates were the same classification as a result of major disciplinary cases[,] and "[b]oth inmates were within the same parameters of age, weight, and height (within 9years, 40 pounds, and 12 inches). *Id.* Thus, Sadler insists, the housing assignment was appropriate. *Id.*

Keeter responds that "[t]he serious risk of harm, including sexual and physical, to LGBTQ people is well known." Dkt. No. 92 at11–12. "TDCJ's own policies, as well as PREA, put [Sadler] on notice about the increased vulnerability to sexual and physical abuse incarcerated LGBTQ people face[.]" *Id.* at10,12. Keeter insists that the substantial risk of serious harm in housing Keeter with Robinson was indicated by the two inmates' disciplinary histories. Robinson's record reflects a "longstanding, pervasive, well-documented, [and] expressly noted risk by prison officials in the past." *Id.* at 9. And Sadler's "fail[ure] to realize [this risk] before authorizing [Keeter's] housing assignment with Robinson" constituted deliberate indifference. *Id.* at 8–9.

The question of a substantial risk of serious harm is an objective one in which the courts ask, "whether society considers the risk….to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 32 (1993). With the benefit of hindsight, the answer in the present case seems clear. But in other contexts, courts have emphasized that hindsight should not influence the deliberate indifference assessment. *See Zaunbrecher v. Gaudin*, 641 F. App'x 340, 346 (5th Cir. 2016) (deliberate indifference to serious medical needs) (citing *Domino*, 239 F.3d at 756; *Wagner v. Bay City*, 227 F.3d 316, 325 (5th Cir. 2000).

The critical question here is whether, at the time Sadler signed Keeter's move slip, the objective risk of housing Keeter with Robinson was so grave and unreasonably excessive that society would not tolerate the reassignment. The most compelling evidence in Keeter's favor on this point is the disparity between the inmates' disciplinary records. Although tempting, whether the risk of being housed with Robinson was substantial cannot be assessed simply by comparing the number of violations. The Court must consider the relationship between the violations and the alleged risk to Keeter.

There is no evidence in Robinson's disciplinary record that he was a sexual predator, or that he had previously assaulted or had compatibility issues with LGBTQ inmates. Dkt. No. 91 at 147. While Robinson's 30-year disciplinary record was extensive, only one of his disciplinary cases involved sexual misconduct, and that involved consensual sex 13 years before these events. Dkt. No. 94 at 36. There is no evidence that Keeter, at any time during her 20-plus years in TDCJ, had been the target of an assault, sexual or otherwise, despite identifying as either bisexual or transgender since entering TDCJ.[8] Dkt. No. 66 at 4; Dkt. No. 91 at 8–10; Dkt. No. 92 at 5. There is no evidence that Keeter had ever been threatened by another inmate during those 20 years, including by Robinson. At the time of the reassignment, Robinson did not know Keeter, or that Keeter was bisexual, Dkt. No. 91 at 9–10. Keeter and Robinson had no previous history together, including conflicts or other indicia of incompatibility. *Id*. at 19.

---

[8] Keeter's testimony is conflicting on when she started identifying as bisexual and transgender. She initially testified that at the time of the assaults, she identified as bisexual, but not transgender. *See* Dkt. No. 91 at 9. Moments later, she testified that she had identified with TDCJ as both bisexual and transgender since entering TDCJ. *See id*. at 10.

There was certainly risk in reclassifying Keeter—or any inmate—from G2 to G5. Likewise, there was risk in housing Keeter—or any inmate—with Robinson. But whatever risks existed at the time were the generalized risks faced by all inmates and inherent in incarceration. *Id*. at 14. Keeter seems to acknowledge that the risk she faced was more general than specific. When asked at her deposition how Sadler would have known in advance that Robinson would assault her, Keeter responded

> I'm not saying that [Sadler] knew he would harm me, but [she] knew that they were sending me to a building full of violent offenders. Major Sadler used to work over there. She knew about all the officers getting beat up, stabbings and killings and rapes. She knew all that and still sent me over right in the middle of that wolf pack.

*Id*. at 18.

Other than Keeter's general references to G5 as being "full of violent offenders" and a "wolf pack," she produces no evidence of any inmate's personal experience in G5, whether hers or that of any other inmate. There is no evidence that any inmate in G5 had previously threatened Keeter or had compatibility issues with Keeter. There is no evidence that Keeter ever expressed a particularized fear or harm that might occur if she was reassigned to G5 or housed with Robinson, until after the attacks.[9] There is also no evidence that Keeter, at any time during her 20 years in TDCJ, previously sought protection from or

---

[9] The lack of evidence for Keeter having expressed specific concerns or risks about G5 is not used here to establish that Sadler, as a result, was subjectively unaware of otherwise obvious risks or harms. *See Farmer*, 511 U.S. at 848. Rather, the lack of evidence for Keeter expressing no more than a generalized fear of G5 suggests that no more than a generalized reason to fear existed. If Keeter knew of a substantial risk of serious harm to her from G5, it is reasonable to assume that she would have expressed it. The absence of evidence for such an expression suggests there was not one to express. This, of course, is not outcome determinative, but only one more consideration in assessing whether a substantial risk of serious harm existed.

had protection denied by any TDCJ officer.

Keeter's fears about being reassigned to G5 are reasonable and understandable. But they are the type of fears any inmate would have upon being reclassified to G5 after a major disciplinary conviction. A failure-to-protect claim requires more than just any risk. The risk must be "excessive" because "[p]rison officials are not . . . expected to prevent all inmate-on-inmate violence." *Adames*, 331 F.3d at 512. To hold that the generalized risk alleged by Keeter are so "unreasonably high" that it would "violate[] contemporary standards of decency to expose anyone unwillingly to such a risk," would effectively mean that no inmate could be classified to G5. *See Helling,* 509 U.S. at 35–36.

Though the risk of being housed in G5 is too general, Keeter does not need to establish that there was risk that Robinson, specifically, would assault Keeter. "[A] prison official [cannot] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843. It is sufficient if the victim prisoner "belongs to an identifiable group of prisoners who are frequently singled out for attack by other inmates." *Id*. "If, for example, prison officials were aware that inmate rape was so common and uncontrolled that some potential victims dared not to sleep . . . it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom." *Id*. (citing *Hutto v. Finney*, 437 U.S. 678, 682, n. 3 (1978) (internal quotation marks).

In this connection, Keeter asserts that "[t]he serious risk of harm, including sexual and physical, to LGBTQ people is well known[.]" Dkt. No. 92 at 11–12. The undersigned

does not doubt the truth of this general proposition. And even though more specific than the risk of G5, this still-general risk cannot be invoked every time an LGBTQ person is assaulted in prison to establish a substantial risk of serious harm. While certainly one factor, without a specific threat of harm something more must also be shown.

*Farmer*'s reference to *Hutto* is instructive here, although by no means exclusive. *Hutto* involved evidence of systemic conditions which gave rise to substantial risks of serious harm.

> The inmates slept together in large, 100-man barracks and some convicts, known as 'creepers,' would slip from their beds to crawl along the floor, stalking their sleeping enemies. In one 18-month period, there were 17 stabbings, all but 1 occurring in the barracks. Homosexual rape was so common and uncontrolled that some potential victims dared not sleep; instead they would leave their beds and spend the night clinging to the bars nearest the guards' station.

*Hutto*, 437 U.S. at 682, n. 3.

The systemic and excessive risks presented in *Hutto* are reflected in other failure-to-protect cases, typically involving an inmate who, despite overt signs of risk factors or repeated outcries, is repeatedly sexually assaulted or attacked, provided no recourse to prison officials, or both. *See e.g.*, *Johnson*, 385 F.3d 503, 512–13 (homosexual inmate with effeminate manner repeatedly raped and sold as sex slave over 18 months); *Zollicoffer v. Livingston*, 169 F.Supp.3d 687, 689 (S.D. Tex. March 14, 2016) (transgender inmate repeatedly raped and assaulted over 12 years at seven different TDCJ units); *Morgan v. Hubert*, 335 F.App'x 466 (5th Cir. 2009) (inmates in protective custody, wearing jumpsuits identifying them as such, placed in a field with general population inmates during evacuation where they were beaten and stabbed).

16

*Farmer* also supports the need for excessive risk. Farmer was a 27-year-old transexual convicted of credit card fraud. She began estrogen therapy at 14 years old and had undergone breast implants and an unsuccessful "black market" testicle removal surgery. *Farmer*, 511 U.S. at 829. The parties agreed that Farmer projected feminine characteristics, including wearing clothing in a feminine manner in prison, such as pulling her shirt down to expose one shoulder. *Id.* Despite these facts, Farmer was transferred from a lower security prison to a higher security prison where she was beaten and raped. *Id.* at 830. While the import of *Farmer* lies in the requirement for subjective indifference, and that prior notice to the official of the risk is not required, the Supreme Court appeared to presume that the facts there constituted a significant risk of serious harm.

Each of these cases is factually distinguishable from Keeter in terms of the significant risk, notwithstanding Robinson's heinous attacks on Keeter. There is little, if any, evidence that Keeter projected feminine characteristics, or that Keeter was overtly bisexual or transgender.[10] This leaves Keeter's status as bisexual. The undersigned is unable to find a case which holds that an inmate's status in terms of sexual orientation or gender identification is alone sufficient to establish a significant risk of serious harm.

Keeter attempts to add more than just her status by offering her testimony that G5 is where the "stabbings and killings and rapes" are going on. But this unsupported statement falls short of creating a triable issue on whether there existed either a specific threat to Keeter or a systemic excessive risk at the Robertson Unit—or even within G5—which

---

[10] Keeter testified that she got "on hormones in '01 [and] I wear a bra (laughing)." Dkt. No. 91 at 10.

reflected that bisexual or transgender inmates were on their own when it came to protection from harm. Moreover, it is well established that "[u]nsubstantiated or conclusory assertions" are insufficient to defeat summary judgment. *Arnett v. Strayhorn*, 515 F.Supp.2d 690, 694 (W.D. Tex. May 16, 2006) (citing *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) and *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994)).

There is no evidence that LGBTQ inmates at the Robinson Unit were categorically exposed to a substantial risk of serious harm by virtue of their status alone, that LGBTQ persons were more commonly assaulted or raped in G5 at the Robinson Unit, or that some other systemic condition existed that exposed Keeter or other LGBTQ inmates to an excessive risk of serious harm in G5. *See Farmer*, 511 U.S. at 843.

Because the undersigned finds that Keeter has failed to create a triable issue on whether she was objectively exposed to a substantial risk of serious harm, it is RECOMMENDED that the Court grant Sadler's Motion for lack of a constitutional violation. But if the Court disagrees and finds that there is a triable issue on the objective prong of deliberate indifference, the undersigned next considers the evidence of Sadler's subjective indifference.

2. Subjective indifference:

Assuming Keeter was exposed to a substantial risk of serious harm, the evidence does not support a triable issue on whether Sadler was deliberately indifferent to it. Considering the extensive briefing by the parties on this issue, the undersigned will first summarize the arguments.

*a. Summary Judgment Briefing*

Sadler maintains that she "was unaware of any underlying facts . . . indicating a sufficiently substantial danger," and that there is no evidence to the contrary. Dkt. No. 90 at 11–15. She insists that "she was not involved in inmate housing assignments, or the policies relied on by the [C]ount [R]oom in housing inmates." *Id*. at 14. Sadler's only role in the reassignment was to "generally authoriz[e] the move by signing a 'move slip.'" *Id.* at 13 (exemplar reprinted below). And the evidence "clearly establishes that the [C]ount [R]oom staff and [C]hief of [C]lassification are responsible for assigning inmate housing," *id.* at 13, and Sadler had no "supervisory authority over [either]." Dkt. No. 95 at 3.



Dkt. No. 91 at 181.

19

The Chief of Classification testified that it was the Chief's responsibility to "ensure that the [C]ount [R]oom is following the policy guidelines of housing inmates appropriately for custody, job, height, weight, age per policy." *Id.* at 136. The Count Room would have determined whether Keeter and Robinson were compatible and, if so, generated a "move slip" to be signed by the "duty warden," which, Sadler concedes, "may have been [her]." Dkt. No. 90 at 13. But the move slip would not have reflected any basis for Sadler to question the Count Room's assignment. *Id.*

As a major, Sadler says that she was not required to be familiar with the classification manual. Dkt. No. 91 at 53. Instead, majors rely on the Count Room to properly classify inmates because the Count Room has access to inmate information relevant to housing decisions, as well as expertise in the relevant TDCJ policies and PREA standards. *Id.* at 1–2. There was no demonstrated need for Sadler to independently audit Count Room housing assignments made under the supervision of the Chief of Classification. *Id.* at 53. Sadler fears that Keeter would nevertheless impose on each major, before signing a move slip, a duty to "individually research and compare disciplinary and classification records of every inmate who is re-housed by the Count Room." Dkt. No. 95 at 1.

Keeter argues broadly that Sadler, as a major, was responsible for the safety and well-being of all inmates. Dkt. No. 92 at 7–8, 10–11. Keeter concedes that Sadler had no personal involvement in the housing assignment but insists that Sadler "implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Id.* at 10 (citing *Thompkins*, 828 F.2d at 304).

20

The deficient policy Keeter relies on is Sadler's *de facto* policy of "acquiescing to the Count Room's housing assignment. *Id.* at 7–8.

Keeter asserts that despite her "vulnerab[ility] to sexual and physical abuse in TDCJ," Sadler "adopted, ratified, and condoned a practice and custom that was the moving force behind [Keeter's] injuries." *Id.* at 10. Sadler "allow[ed] the Count Room unvetted discretion to determine [Keeter's] housing assignment which placed [Keeter] in substantial risk of serious harm to be sexually abused by Robinson." *Id.* at 11. In failing to personally review Keeter's housing assignment, [Sadler] "condoned TDCJ's custom and practice of blindly signing an inmate's 'move slip' after the Count Room's housing recommenda-tion[.]" *Id.* at 12. Keeter insists that Sadler "cannot avoid liability simply by placing the blame on the Count Room" *Id.*

Keeter neither argues nor presents evidence that Sadler was consciously aware of the risk posed by the housing assignment, or that Sadler drew such an inference. Rather, Keeter urges that Sadler's liability is established inferentially because the risk was obvious. *See Farmer,* 511 U. S. at 842. Keeter argues that it is enough to survive summary judgment if "evidence showing a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and [] circumstances sug-gest[ing] that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it[.]" Dkt. No. 92 at 9 (quoting *Farmer*, 511 U.S. at 842-43). The evidence Keeter relies on for the "longstanding, pervasive, well-documented" risk is Robinson's disciplinary record.

    *b.*    *Analysis*

The evidence is undisputed that the Count Room, under the supervision of the Chief of Classification, made Keeter's housing assignment. It was the Count Room, not Sadler, which had access to the inmate information and classification policies necessary to meaningfully assess inmate compatibility criteria and make housing assignments. The move slip presented to Sadler reflected only Keeter's name, race, former building and cell assignment, and the new building and cell assignment. Dkt. No. 91 at 181. It did not reflect Keeter's status as bisexual or any other vulnerabilities. *Id*.

The move slip also did not reflect Robinson's name, his disciplinary record, or any other information from which Sadler could reasonably deduce a need to question the Count Room's housing assignment. *Id*. There was nothing on the move slip to suggest that Keeter was about to be exposed to a substantial risk of serious harm, or to trigger a need to look further. Sadler testified that she has no recollection of Robinson, did not review his record before signing the move slip, and had no reason to review his record because the Count Room would do that. *Id*. at 68.

The fact that TDCJ did not include on the move slip information necessary to question the Count Room's assignment is evidence that TDCJ did not expect, nor want, the majors signing those slips to do so. And there is no evidence to the contrary. Nor is it reasonable to expect them to do so with such limited information. Nothing about the move slip, or in the evidence, suggests that it was designed or intended to enable majors to qualitatively question and reassess the Count Room's assignments. Rather, the move slip appears to be an administrative tool used solely to maintain accurate inmate counts. Keeter

also has produced no evidence or caselaw to suggest that Sadler misused the move slip, failed to give effect to its intended purpose, was obligated to do more than she did, or that any other TDCJ major has ever done what Keeter claims Sadler was required to do.

Additionally, there is no evidence that Sadler's acquiescence—or any other major's acquiescence—to the Court Room housing assignments caused or was the moving force behind any other inmate's harm. Thus, even if Sadler had a *de facto* policy of acquiescing to the Count Room, it would not constitute "a repudiation of constitutional rights" or "the moving force of [a] constitutional violation." *Thompkins*, 828 F.2d at 304 (internal citation and quotation marks omitted); *see also Porter*, 659 F.3d at 446.

Further, there was nothing to impart actual or constructive notice to Sadler of the need to question the *de facto* policy of acquiescing to the Count Room, or to modify the policy, or to create a new policy. *See Porter*, 659 F.3d at 447. As explained, actual or constructive knowledge can be attributed to a supervisor, but doing so requires "at least a pattern of similar violations." *McCully*, 406 F.3d at 383. Keeter's experience, while horrific, is a pattern of one, at least based on the summary judgment evidence.

Other than general concerns about G5, Keeter has not provided evidence that any other LGBTQ inmate had been assaulted in G5 or assaulted by Robinson. Nor has she provided evidence that any inmate—LGBTQ or otherwise—had been similarly assaulted after being transferred to G5 from a lower custody classification level because of the move slip authorization process. The absence of evidence for even a single similar harm is, of course, fatal to Keeter's ability to show a pattern of such harms. But there is no evidence here of similar harms—or any harm—befalling inmates because of the Count Room's

23

housing assignment process. Absent such a pattern, Sadler's reliance on the Count Room cannot support a claim of deliberate indifference.

Still, Keeter seeks to demonstrate Sadler's actual or constructive knowledge of a need to stop blindly relying on the Count Room's housing assignments. Keeter must present evidence that the "specific injury suffered" was a "highly predictable consequence" of the supervisor's "failure to implement [or modify] a policy." *See Hutcheson*, 994 F.3d at 482. Removing the distortion of hindsight, there is no evidence to support a finding that Robinson's assaults on Keeter were the highly predictable consequence of Sadler not questioning a move slip that indisputably did not identify Robinson, reflect his disciplinary record, or contain any other basis for Sadler to be concerned.

There is one final path for Keeter to establish Sadler's subjective indifference. Keeter argues that Robinson's disciplinary record is "evidence showing a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials . . . and [the] circumstances suggest that the defendant . . . had been exposed to information concerning the risk and thus must have known about it[.]" Dkt. No. 92 at 9 (quoting *Farmer*, 511 U.S. at 842-43). Because there is no direct evidence of Sadler knowing Robinson's disciplinary history, Keeter must rely on "circumstances suggest[ing]" she had been exposed to it such that she must have known about it.

The circumstances upon which Keeter relies to impose liability on Sadler are these:

Q.        And do you think that Major Sadler had knowledge that Robinson was going to assault you?
Keeter:   That's a question I wouldn't know.
Q:        Okay. Well --

24

> Keeter:    I know she would have been exposed to his file the same as she
> was mine. She would have known his history. It was long-
> standing.

Dkt. No. 91 at 18.

These are not the type of circumstances the Supreme Court in *Farmer* indicated
were sufficient to impart constructive knowledge. As an example of when circumstances
are sufficient, the Supreme Court said that an official "would not escape liability if the
evidence showed that he merely refused to verify underlying facts that he strongly sus-
pected to be true, or declined to confirm inferences of risk that he strongly suspected to
exist (as when a prison official is aware of a high probability of facts indicating that one
prisoner has planned an attack on another but resists opportunities to obtain final confir-
mation[.]")". *Farmer*, 511 U.S. at 843, n. 8.

Here, there is no evidence either that Sadler strongly suspected a significant risk to
Keeter and declined to confirm it, or that a high probability of facts indicated Robinson
was planning an attack on Keeter. The Supreme Court in *Farmer* cautioned that "courts
should be careful to ensure that the requirement of subjective culpability is not lost[;] [i]t
is not enough merely to find that a reasonable person would have known, or that the de-
fendant should have known. . . ." At best, Keeter's allegations and evidence would support
an inference that Sadler should have known, which is not enough.

At base, Keeter's allegations are general and sound in negligence. She argues that
Sadler: "failed to take reasonable steps;" was responsible because she was a major; had a
duty to safeguard and protect inmates; acquiesced in the Count Room decision and should
have reviewed their work; and "failed to realize" Robinson's extensive disciplinary record.

Yet Keeter acknowledges that in over 20 years with TDCJ, this was the first time she had been assaulted, sexually or otherwise. These allegations, and what little evidence supports them, suggest negligence, some under the closed path of *respondeat superior*, but not deliberate indifference. To impose liability on Sadler for the Count Room's single failure here solely because Sadler was a supervisor is the definition of *respondeat superior*. *See Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 130-31 (Tex. 2018) (doctrine of respondeat superior holds one person may be vicariously liable for the acts of another based solely on their relationship).

To be clear, Keeter should not have been housed with Robinson. Certain persons involved in this process were likely negligent, possibly grossly so. And Keeter's argument that the risk to her could have easily been avoided by referring to the two inmates' disciplinary histories may be true. Keeter and Robinson's respective institutional histories alone are vastly different, even before considering Keeter's sexuality. "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. And here, there is no evidence—or even allegation—that Sadler perceived the risk that lie ahead for Keeter or drew the inference that approving the move slip, or acquiescing to the Count Room, would expose Keeter to a substantial risk of serious harm. Keeter acknowledges that her claim against Sadler is premised on Sadler's "*fail[ure] to realize* [this risk] before authorizing [Keeter's] housing assignment. . .." Dkt. No. 92 at 8–9. (emphasis added).

26

Because the undersigned finds that Keeter has failed to create a triable issue on whether Sadler was subjectively indifferent to Keeter's need for protection, it is RECOMMENDED that the Court grant Sadler's Motion for lack of a constitutional violation. But if the Court disagrees, the undersigned RECOMMENDS that the Court still grant Sadler's Motion on the basis of qualified immunity.

### C. Qualified Immunity

A governmental employee who is sued under § 1983 may assert qualified immunity as an affirmative defense to liability. *White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992). Qualified immunity protects government officials performing discretionary functions from suit and liability for civil damages to the extent their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To survive an invocation of qualified immunity, Keeter must not only show a constitutional violation, but also that she had a clearly established right to be free from such a violation. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009).

A constitutional right is clearly established "only if 'the contours of the right were sufficiently clear that a reasonable official would understand that what he was doing violated that right.'" *Perniciaro v. Lea*, 901 F.3d 241, 255 (5th Cir. 2018) (brackets omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Ordinarily, this means that existing precedent has "placed the statutory or constitutional question beyond debate." *Hanks v. Rogers*, 853 F.3d 738, 746–47 (5th Cir. 2017).

Courts must ensure that they do not "define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. So, although the law does not require a case similar in every respect, clearly established law "must be particularized to the facts of the case." *Arzabala v. Weems*, No. 5:21-CV-00268-H, 2024 WL 1018530, at *5 (N.D. Tex. Mar. 8, 2024) (Hendrix, J.) (citing *White v. Pauly*, 580 U.S. 73, 79–80 (2017)).

There are, though, rare instances where "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 64 (2018); *see also Darden*, 880 F.3d at 727. For instance, it is clearly established that rape cannot be used as a punishment, and that an "official may not simply send the inmate into the general population to fight off attackers." *Id.* However, "it is not clear exactly what type of action an official is legally required to take under *Farmer*" to protect inmates from assaults. *Id.* (internal citations and quotation marks omitted).

Even if an official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable under the circumstances. *See Jones v. Collins*, 132 F.3d 1048, 1052 (5th Cir. 1998).

As for Keeter's clearly established right, she is succinct:

> It is well-established that a prison official, let alone the Major of Correctional Officers responsible for overseeing the daily operations of a TDCJ unit, has a duty to safeguard and protect inmates from serious risk of harm.

Dkt. No. 92 at 12. A duty "to safeguard prisoners from serious risk of harm" is precisely the kind of high generality that is forbidden at the qualified immunity stage. *See al-Kidd*,

563 U.S. at 742. The contours of such a right are far from clear and leave the official guessing about what might, and what might not, violate that right. Keeter's failure to particularize that right to the facts of this case is fatal to any attempt to deprive Sadler of qualified immunity.

Thus, even if Keeter had shown a triable issue on the existence of a constitutional violation, the undersigned would still RECOMMEND that the Court grant Sadler's Motion.

### D. Injunctive Relief

Keeter also brings claims for declaratory and injunctive relief. *See* Dkt. No. 66 at 9. "Qualified immunity is not a defense to claims for declaratory and injunctive relief." *Leggett v. Duke*, 279 F. App'x 301, 302 (5th Cir. 2008). Ordinarily, "because the qualified immunity analysis takes place early in the case [] no issues other than qualified immunity" would be "properly before the Court at this time." *Morrow v. Meachum*, 2017 WL 4124285, at *14 (N.D. Tex. Sep. 18, 2017). However, Keeter's request for injunctive relief was premised on her failure to protect claim. *See* Dkt. No. 66 at 8–9. Since she fails to show a genuine issue of material fact on this claim, her requests for injunctive and declaratory relief must also be dismissed. *See also Hill v. City of Seven Points*, 2002 WL 243261, at *18 (5th Cir. Jan. 17, 2002) (unpublished) (when dismissed on grounds other than whether case law "clearly established" issues not before the court may be "intertwined" with qualified immunity).

## VI.   CONCLUSION

For the reasons above, the undersigned RECOMMENDS that the Court GRANT Defendant's Motion, Dkt. No. 89, and DISMISS Plaintiff's § 1983 claims against Sadler.

Furthermore, because Plaintiff's remaining claims seeking declaratory and injunctive relief are based on deliberate indifference, the undersigned RECCOMENDS the Court DISMISS those claims.

## VII.   RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## VIII.  TRANSFER OF CASE

Because the parties have not consented to the undersigned exercising the full jurisdiction of this Court, the undersigned ORDERS that this case be TRANSFERRED under

Special Order No. 3-355 to the docket of United States District Judge James Wesley Hendrix and designated as Civil Action No. 1:20-CV-00066-H.

ORDERED this 28th day of February 2025.

_____

JOHN R. PARKER